249 F.3d 921 (9th Cir. 2001)
 DAWN CASE, PLAINTIFF-APPELLANT,
v.
KITSAP COUNTY SHERIFF'S DEPARTMENT; KITSAP COUNTY; KITSAP COUNTY PROSECUTOR'S OFFICE; OFFICER LAFRANCE, A KITSAP COUNTY SHERIFF'S DEPARTMENT POLICE OFFICER; DEPUTY BALL, A KITSAP SHERIFF'S DEPARTMENT OFFICER; DEPUTY BERGENSON, A KITSAP COUNTY SHERIFF'S DEPARTMENT OFFICER; DEPUTY BURROWS, A KITSAP COUNTY SHERIFF'S DEPARTMENT OFFICER AND JOHN DOE, DEFENDANTS-APPELLEES.
 No. 98-36260
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted October 6, 2000
Filed May 9, 2001
 
 [Copyrighted Material Omitted]
 Clayton Ernest Longacre, Port Orchard, Washington, for the plaintiff-appellant.
 Jon Walker, Kitsap County Prosecuting Attorney's Office, Port Orchard, Washington, for the defendants-appellees.
 Appeal from the United States District Court for the Western District of Washington Robert J. Bryan, District Judge, Presiding. D.C. No. CV-97-05437-RJB
 Before: Arthur L. Alarcon, Warren J. Ferguson, and M. Margaret McKeown, Circuit Judges.
 McKEOWN, Circuit Judge:
 
 
 1
 At issue in this appeal is whether a reasonable officer could believe that entering a Washington residence to arrest appellant Dawn Case on an Oregon arrest warrant was consistent with Case's constitutional rights. Following her arrest in Kitsap County, Washington, Case brought suit against Kitsap County, Kitsap County Sheriff's Department, and various individuals (collectively "the County") under 42 U.S.C. § 1983. The district court granted summary judgment in favor of the County on all claims and denied Case's motion for reconsideration.
 
 
 2
 On appeal, Case challenges the district court's ruling that the deputies are entitled to qualified immunity and that Kitsap County and Kitsap County Sheriff's Department are not subject to municipal liability. Case also argues that the district court erroneously dismissed her state law outrage claim. We affirm.
 
 BACKGROUND
 
 3
 This case stems from Case's 1993 delinquencies in her child support payments, in violation of an Oregon court order. The State of Oregon charged Case with contempt for willfully disobeying the order on eleven occasions, and the circuit court for Yamhill County, Oregon issued a warrant for her arrest. Pursuant to that warrant, Case was arrested in Oregon and spent one day in jail. She pled guilty to the contempt charge, and the Oregon court placed her on probation for two years, ordering her to serve forty-eight hours in jail for each month she failed to make child support payments and ordering that failure to report to jail would result in a warrant for her arrest.
 
 
 4
 While on probation, Case again failed to make a child support payment and failed to report to jail, so in December 1993, the Oregon court again issued a warrant for Case's arrest. That warrant was entered into the National Crime Information Center computer system ("NCIC"), which is a national criminal records data system administered by the Federal Bureau of Investigation. See 28 U.S.C. § 534. NCIC contains criminal history information, including outstanding arrest warrants, and is available to police departments nationwide. State law enforcement agencies are connected to NCIC through their computer systems. In Oregon, only felony warrants may be entered into NCIC--it is a violation of Oregon State Police policy to enter non-felony warrants into the system. Similarly, in Washington, law enforcement agencies generally cannot enter non-felony arrest warrants into NCIC.
 
 
 5
 In August 1994, the District Attorney's Office for Yamhill County obtained information that Case was living with Christopher Russell in Kitsap County. Prior to that time, the office had tried without success to find her. In October 1994, the office obtained Case's Kitsap County address and telephone number. Bonnie Sliper of the Yamhill County District Attorney's Office called Case's Kitsap County telephone number and confirmed that Case lived there.[1]
 
 
 6
 Sliper thereafter contacted Kitsap County, stating that there was an outstanding Oregon arrest warrant for Case for "failure to pay court-ordered child support. Criminal nonsupport." Sliper also stated that the warrant should be in NCIC. Although Sliper believed that the warrant was for a felony offense, Sliper did not specifically inform the dispatcher that it was for a felony. She gave the dispatcher Case's Kitsap County address and noted that Case had misrepresented her identity to law enforcement in the past.
 
 
 7
 The dispatcher confirmed that the warrant was listed in NCIC. The NCIC listing indicated that Yamhill County would extradite Case. The dispatcher relayed this information to the warrants division of Kitsap County Sheriff's Department. Deputy Burrows, a deputy in the warrants division, concluded that the warrant was for a felony offense. Deputy Burrows had been with the sheriff's office for fifteen years and was certified to use Washington's computerized access system, including NCIC. Thereafter, he went to the Kitsap County residence, where he encountered Russell. When Deputy Burrows explained that he wanted to speak with Case, Russell informed him that Case was staying at the house but that she was out. Deputy Burrows gave Russell his card and asked that Case call him.
 
 
 8
 Later that day, Deputy Burrows gave Case's file to Deputy LaFrance for follow-up. Because Case had tried to evade the police in the past by misrepresenting her identity, Deputy LaFrance called Sliper, who confirmed that Case had used false names numerous times in the past. Deputy LaFrance obtained a photo of Case and other descriptive information from Sliper. The next day, Deputy LaFrance drove out to arrest Case at the residence. While he was en route, Case called the Kitsap County Sheriff's Office from the residence and spoke with Deputy Burrows, who told Case to stay at the house because a sheriff's deputy was on his way to see her. Deputy Burrows then informed Deputy LaFrance that Case had just called and that she was at the house, expecting his arrival.
 
 
 9
 Deputy LaFrance, in uniform, arrived at the house a few minutes later. He knocked on the door and announced that he was from the sheriff's office, but no one answered. Deputy LaFrance observed a light on in the house and four vehicles in the driveway. A neighbor informed him that no one had left the house all day. Deputy LaFrance then called Deputy Burrows and asked him to call the house. While Deputy LaFrance waited outside the house, he heard the phone ring inside. When Russell picked up the phone, Deputy Burrows asked for Case. Russell responded that Case was not there.
 
 
 10
 Deputy LaFrance continued to knock repeatedly on the door, but again no one answered. He called for assistance from two other deputies in the area and, upon their arrival, they took up positions around the house in the event that someone attempted to flee. When Deputy Burrows tried calling the house again, no one answered the phone, so he left a message on the answering machine, requesting that the persons inside the house exit the house from the front door. The deputies also gave a warning over the radio loudspeaker.
 
 
 11
 After receiving no response, Deputy LaFrance opened an unlocked window near the front door in an attempt to survey the interior of the residence prior to entering. He pulled back the shade of the window, with his gun drawn, and saw Russell in the front room. Russell asked LaFrance whether he had a warrant. Officer LaFrance responded that he had an arrest warrant and repeatedly demanded that Russell open the door, informing him that the deputies were there to arrest Case.
 
 
 12
 After Russell refused to open the door, Deputy LaFrance kicked it in. The deputies secured Russell in the front room and asked him where Case was located. Russell at first refused to answer, but ultimately responded that he did not know. Deputy LaFrance and one of the other deputies searched the residence and found Case hiding in a closet, whereupon they arrested her.
 
 
 13
 The deputies transported Case to jail and booked her. Two hours after Case's arrest, the deputies received a copy of the Oregon warrant and Yamhill County confirmed that it would extradite her. Case was charged in Kitsap County with being a fugitive from justice on the Oregon warrant. Three days later, she was released, and the Washington court thereafter dismissed the fugitive charge without prejudice.
 
 
 14
 Case then brought the present action in the superior court for the State of Washington, alleging under § 1983 that the County violated her constitutional rights for false arrest and imprisonment, illegal search and seizure, negligent investigation of the warrant, trespass, and malicious prosecution. Case also claimed that the County committed the tort of outrage under Washington law. The County removed the case to federal court. The district court granted the County's motion for summary judgment and ruled that the deputies are entitled to qualified immunity[2] and that Kitsap County and Kitsap County Sheriff's Department are not subject to municipal liability. The district court also dismissed Case's outrage claim and denied Case's motion for reconsideration.
 
 ANALYSIS
 A. Qualified Immunity
 
 15
 We review de novo the district court's grant of summary judgment. United States v. Muckleshoot Indian Tribe, 235 F.3d 429, 432 (9th Cir. 2000). "In deciding whether Defendants are entitled as a matter of law to qualified immunity, we must accept the facts in the light most favorable to the Plaintiffs and then determine whether, in light of clearly established principles governing the conductin question, the officers objectively could have believed that their conduct was lawful." Mena v. City of Simi Valley, 226 F.3d 1031, 1036 (9th Cir. 2000).
 
 
 16
 The Supreme Court has recognized that qualified immunity " `provides ample support' to all but the plainly incompetent or those who knowingly violate the law," protecting officers from violations of constitutional magnitude. Burns v. Reed, 500 U.S. 478, 494-95 (1991) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). In determining whether the deputies are entitled to qualified immunity, we must ask two questions: (1) Was the law governing the officer's conduct clearly established? (2) Under that law, could a reasonable officer believe that the conduct was lawful? See Mena, 226 F.3d at 1036.
 
 
 17
 Only the second prong of the qualified immunity analysis is at issue here, as the parties do not dispute that Case's constitutional rights were "clearly established. " We hold that the deputies are entitled to qualified immunity because a reasonable officer could believe that the conduct did not violate Case's constitutional rights.
 
 
 18
 1. Case's Arrest in Washington on a Valid Oregon Warrant
 
 
 19
 The first question we address is whether a reasonable officer could believe that Case's arrest on the Oregon warrant was lawful. It requires little analysis to reach an affirmative answer. Not only did Case concede that the warrant was valid, but a reasonable officer could believe that the deputies' execution of the Oregon warrant in Washington was constitutionally permissible.
 
 
 20
 a. The Warrant Was Valid
 
 
 21
 It is well established that, in an action for unlawful arrest pursuant to a facially valid warrant, a police officer is entitled to qualified immunity unless "no officer of reasonable competence would have requested the warrant." Malley, 475 U.S. at 345-46 & n.9; accord Barlow v. Ground , 943 F.2d 1132, 1139 (9th Cir. 1991) ("A police officer generally has qualified immunity for conducting an unconstitutional search if he is acting on the basis of a facially valid warrant."); Mills v. Graves, 930 F.2d 729, 731 (9th Cir. 1991) (noting that "immunity will be lost only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable").
 
 
 22
 Here, Case admits that the Oregon warrant was valid. In other words, Case admits that a neutral, detached Oregon judicial officer correctly made a finding of probable cause to arrest her. She does not challenge the facts underlying the valid warrant, or the reasonableness of the officers who requested it. Our analysis, then, turns to whether a reasonable officer could believe that he could arrest Case in Washington on the Oregon warrant.
 
 
 23
 b. Washington Law Permits a Felony Arrest Without a Washington Warrant
 
 
 24
 Case argues that the deputies could not execute the Oregon warrant in Washington. We disagree. Washington statutes provide for execution of out-of-state felony warrants within Washington's borders without a separate Washington warrant. A reasonable officer could therefore believe that the deputies' conduct was constitutionally permissible.
 
 
 25
 Under Washington's Uniform Criminal Extradition Act, Wash. Rev. Code ("RCW") § 10.88 et seq., where an out-of-state crime is alleged and the accused has fled from justice, an officer may obtain an arrest warrant from a Washington judge or magistrate:
 
 
 26
 Whenever any person within [the State of Washington] shall be charged on the oath of any credible person before any judge or magistrate of this state with the commission of any crime in any other state and . . . with having fled from justice . . . or whenever complaint shall have been made before any judge or magistrate in this state setting forth on the affidavit of any credible person in another state that a crime has been committed in such other state and that the accused has been charged in such state with the commission of the crime, and . . . has fled from justice . . . the judge or magistrate shall issue a warrant directed to any peace officer commanding him to apprehend the person named therein, wherever he may be found in this state . . . .
 
 
 27
 RCW § 10.88.320 (emphasis added).[3] But the rule is different when the officer has reasonable information that the accused has been charged with a felony--in that case, the officer may arrest the individual without a Washington arrest warrant. See RCW § 10.88.330 ("The arrest of a person may be lawfully made . . . without a warrant upon reasonable information that the accused stands charged in the courts of a state with a crime punishable by death or imprisonment for a term exceeding one year . . . .") (emphasis added); accord RCW § 10.31.100 ("A police officer having probable cause to believe that a person has committed . . . a felony shall have the authority to arrest the person without a warrant.").
 
 
 28
 Nor does it make common sense that the officers needed to obtain a duplicate Washington warrant. The Oregon warrant already served as a reasonable basis for"probable cause to believe that a person has committed . . . a felony." RCW § 10.31.100. As the Tenth Circuit observed in a similar circumstance, "where state officers are arresting a person within their state, neither precedent nor logic requires a second arrest warrant to be obtained when a valid warrant has been issued in another state." United States v. Smith, 131 F.3d 1392, 1397-98 (10th Cir. 1997); accord Lowrance v. Pflueger, 878 F.2d 1014, 1020 (7th Cir. 1989) (concluding that officers in Wisconsin were entitled to qualified immunity for arrest based on a Tennessee warrant that they confirmed through NCIC); United States v. Johnson, 815 F.2d 309, 313-14 (5th Cir. 1987) (holding that federal officers were authorized under Texas law to arrest the defendant in Texas on an outstanding California warrant); Ierardi v. Gunter , 528 F.2d 929, 931 (1st Cir. 1976) ("If . . . the papers submitted by Florida were to show that a judicial officer or tribunal there had found probable cause, Massachusetts would not need to find probable cause anew, nor would it need to review the adequacy of the Florida determination."); Allen v. Wrightson, 800 F. Supp. 1235, 1238 (D.N.J. 1992) ("Whether the probable cause determination made prior to plaintiff's arrest was made by a judicial officer [where warrant was issued] or[where plaintiff was arrested] is immaterial for Fourth Amendment purposes.").
 
 
 29
 Here, because the deputies had reasonable information that the Oregon warrant was for a felony, they could lawfully arrest her without a Washington warrant. At the outset, the Yamhill County District Attorney's Office informed Kitsap County that the warrant was for "Criminal nonsupport," which is a Class C felony in Oregon. See Or. Rev. Stat. § 163.555. Contrary to Case's contentions, there is nothing on the face of the warrant that would lead a reasonable officer to conclude that it was not for a felony or criminal offense.[4] It is also significant that the Kitsap County dispatcher and the deputy confirmed that the warrant was listed on NCIC. Based on that information, a reasonable deputy could have concluded that the warrant was for a felony. Indeed, under national NCIC standards, in both Washington and Oregon, only felony arrest warrants are ordinarily entered into NCIC.
 
 
 30
 There is a long line of cases from this and other circuits that an "NCIC hit," although not definitive in terms of conviction, "has been routinely accepted in establishing probable cause for a valid arrest." United States v. Hines, 564 F.2d 925, 927 (10th Cir. 1977); see also Scull v. New Mexico, 236 F.3d 588, 599 (10th Cir. 2000) (because the officials"believed they had the lawful authority to imprison [defendant] based on the NCIC hit," defendant could not show that they "knew that they had no lawful authority" to imprison him for purposes of his false imprisonment claim); United States v. Munoz, 150 F.3d 401, 411-12 (5th Cir. 1998) (concluding that officers' knowledge, through NCIC, of outstanding warrant, along with a reasonable belief that the defendant was in the apartment, "sanctioned going into the apartment " to arrest him), cert. denied, 525 U.S. 1112 (1999); Brooks v. George County, 84 F.3d 157, 167 n.12 (5th Cir. 1996) (noting that "NCIC printouts provide a reliable basis for probable cause to arrest"); United States v. Towne, 870 F.2d 880, 884 (2d Cir. 1989) (finding probable cause to arrest where officer learned of out-of-state warrant after conducting a background check on NCIC, contacted out-of-state authorities to confirm warrant, and requested and received certified copy of warrant before arresting the defendant); United States v. Roper, 702 F.2d 984, 989 (11th Cir. 1983) (finding probable cause to arrest where officer radioed NCIC and learned of warrant); United States v. McDonald, 606 F.2d 552, 553-54 (5th Cir. 1979) ("While NCIC printouts are not alone sufficient [e]vidence to permit [c]onviction, the cases uniformly recognize that NCIC printouts are reliable enough to form the basis of the reasonable belief which is needed to establish probable cause for arrest.") (footnote omitted); United States v. Davis, 568 F.2d 514, 516 (6th Cir. 1978) ("An NCIC identification of a vehicle is sufficient to establish probable cause for the arrest of one possessing it . . . ."); United States v. Palmer, 536 F.2d 1278, 1283 (9th Cir. 1976) (concluding that probable cause existed for the defendant's arrest based on information obtained from NCIC and other evidence suggesting that the defendant was, in fact, the suspect identified on NCIC).
 
 
 31
 Finally, we note that arresting a suspect on a warrant issued by another state is not a question of state sovereignty, especially where, as here, Washington law specifically allows such a procedure. Cf. Dissent at 5915-18; Washington v. Lee, 738 P.2d 1081, 1083 (Wash. Ct. App. 1987) (concluding that "Washington has no `power' over the out-of-state defendant [who was located in Oregon] until extradition procedures are completed").[5] Rather, the question here, under the qualified immunity analysis, is whether a reasonable officer could believe that the deputies could arrest Case on the Oregon warrant without violating her constitutional rights. See Anderson v. Creighton, 483 U.S. 635, 636-37 (1987) (holding that a "law enforcement officer who participates in[conduct] that violates the Fourth Amendment may [not] be held personally liable . . . if a reasonable officer could have believed that the [conduct] comported with the Fourth Amendment").
 
 
 32
 c. Post-Arrest Conduct
 
 
 33
 Case argues that the deputies are not entitled to qualified immunity because, after arresting her, they failed to take her before a Washington judge or magistrate "with all practicable speed" so that a complaint could be made against her, setting forth the grounds for arrest, as required by Washington law. RCW § 10.88.330 (outlining procedures for arrest without a warrant under the Uniform Criminal Extradition Act). Case also argues that under an internal departmental policy, absent exigency, a teletype request for arrest by another state based on a felony warrant "should be sent to the prosecutor's office to have a fugitive warrant issued." In short, Case claims that even after her arrest, a Washington warrant was required. The deputies here did not obtain one. Nevertheless, Case's argument fails.
 
 
 34
 Whether the deputies violated a state law or an internal departmental policy is not the focus of our inquiry. See Wilson v. Meeks, 52 F.3d 1547, 1554 (10th Cir. 1995) (finding qualified immunity; "[V]violation of a police departmental regulation is insufficient for liability under section 1983."); Gagne v. City of Galveston, 805 F.2d 558, 560 (5th Cir. 1986) ("[A]llegations about the breach of a statute or regulation are simply irrelevant to the question of an official's eligibility for qualified immunity in a suit over the deprivation of a constitutional right."); Backlund v. Barnhart, 778 F.2d 1386, 1390 n.5 (9th Cir. 1985) (concluding that any state violation of its own policy is "irrelevant" to the question of whether state officials are entitled to qualified immunity).
 
 
 35
 Rather, our focus is on whether a reasonable officer would have known that the deputies' conduct violated Case's federal statutory or constitutional rights rather than merely a state law or policy provision. Davis v. Scherer, 468 U.S. 183, 194 & n.12 (1984) ("Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision," unless the statute or regulation violated gives rise to the cause of action brought.); see also Herring v. Keenan , 218 F.3d 1171, 1180 (10th Cir. 2000) (finding qualified immunity; "[W]ithout a stronger indication . . . that a reasonable . . . officer . . . would have known that she was violating . . . constitutional rights . . . rather than simply violating an internal policy, we cannot say that [the officer] violated [the plaintiff's] clearly established constitutional right . . . ."); Gardner v. Howard, 109 F.3d 427, 430 (8th Cir. 1997) (finding qualified immunity; "[T]here is no § 1983 liability for violating prison policy. [Plaintiff] must prove that[the official] violated his constitutional right . . . ."); Gagne, 805 F.2d at 560 (whether an official is entitled to qualified immunity "must be answered solely by an inquiry into whether the constitutional right at issue was clearly established at the time of the events in question"); Backlund, 778 F.2d at 1390 (dismissing plaintiffs' § 1983 claim because they "failed to show a violation of any constitutional right," despite violation of internal policy).
 
 
 36
 Here, even if a reasonable officer were schooled in the intricacies of Washington's extradition statutes, we conclude that a reasonable officer could believe that the deputies' conduct did not violate Case's constitutional rights. See Ward v. County of San Diego, 791 F.2d 1329, 1332 (9th Cir. 1986) (noting that we do not "require of most government officials the kind of legal scholarship normally associated with law professors and academicians"). The deputies acted pursuant to a valid Oregon warrant for a felony offense. Within two hours after Case's arrest, the deputies obtained a copy of the warrant from Yamhill County, and Yamhill County confirmed that it would extradite Case. A reasonable officer could conclude that failure to obtain a Washington warrant at that point did not violate Case's constitutional rights. Therefore, the deputies are entitled to qualified immunity.
 
 2. Entering the Residence to Arrest Case
 
 37
 Armed with a felony warrant and the reasonable belief that Case resided at Russell's house, an officer could have reasonably believed that entering the residence to arrest Case was lawful. In Payton v. New York, 445 U.S. 573, 602-03 (1980), the Supreme Court held that officers acting pursuant to a felony arrest warrant may, consistent with the Constitution, enter a suspect's residence to arrest the suspect when there is reason to believe that the suspect is presently in the residence. Recognizing that "[i]n none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home," the Court noted that "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." Id. at 590.
 
 
 38
 The warrant requirement under Payton ensures that, absent exigent circumstances, the neutral judgment of a judge or magistrate precedes a home arrest. This is not a case about exigent circumstances; it is a case about a valid arrest warrant. There is no question that the Oregon warrant in this case was valid and issued on probable cause. Therefore, the only question under Payton is whether a reasonable officer could have "reasonable grounds for believing" that the suspect resided in the residence. See Perez v. Simmons, 884 F.2d 1136, 1140 (9th Cir. 1988), amended, 998 F.2d 775, 776 (9th Cir. 1993). Without such a belief, the officers cannot enter the home absent exigent circumstances, because an arrest warrant does not justify entry into a third person's home.
 
 
 39
 Addressing circumstances that are apropos to Case, the Eighth Circuit held that, for Fourth Amendment purposes, a person can have more than one residence:We have found no authority to support [the defendant's] implicit assumption that a person can have only one residence for Fourth Amendment purposes. Rather, when evaluating [the defendant's] expectation of privacy in his home, we are guided by the principle that, so long as [the suspect] possesses common authority over, or some other significant relationship to, the . . . residence, that dwelling"can certainly be considered . . . `home' for Fourth Amendment purposes, even if the premises are owned by a third party and others are living there, and even if [the suspect] concurrently maintains a residence elsewhere as well."
 
 
 40
 United States v. Risse, 83 F.3d 212, 217 (8th Cir. 1996) (citations omitted) (concluding that the officers reasonably believed that the suspect resided in the house where she told officers that she was "staying with" the defendant and that they could contact her at the residence, a confidential informant told one officer that she was living there, and the officers twice successfully contacted her there but were unable to contact her at the other address).
 
 
 41
 By Case's own account in her complaint, she resided in the Kitsap County residence. She also conceded that the information available to the deputies at the time of her arrest "confirmed that, at most, she stayed at Mr. Russell's home from time to time." Indeed, at the time of the arrest, the deputies had no evidence suggesting that Case was not, at a minimum, a co-resident of the Kitsap County residence. Certainly, a reasonable officer under the circumstances here could have believed that she was. The Yamhill County District Attorney's Office informed Kitsap County that Case lived there, and Deputy Burrows's initial conversation with Russell was consistent with the conclusion that Case lived there, at least part of the time. By all indicia, she was far more than a mere "overnight guest." Case presents insufficient evidence supporting her argument that a reasonable officer would have investigated her residency further or why further investigation would preclude a reasonable officer from concluding that she was a co-resident of the Kitsap County residence.
 
 
 42
 Moreover, the deputies could have reasonably believed that Case was in the house when Deputy LaFrance went there to arrest her, based on their recent telephone conversation with her. Neither Case nor Russell responded to the deputies' knocks on the door, telephone calls, or warning over the loud-speaker, even though Case knew the deputies were coming over. Under the circumstances, a reasonable officer could believe that forcibly entering the house to arrest Case was lawful. Notably, the deputies' entry into the house was consistent with Washington law. See RCW § 10.31.040 ("To make an arrest in criminal actions, the officer may break open any . . . door, or windows of a dwelling house . . . , if, after notice of his office and purpose, he be refused admittance.").
 
 
 43
 In sum, we hold that the deputies are entitled to qualified immunity.
 
 B. Municipal Liability
 
 44
 The district court also properly dismissed Case's claims against Kitsap County and Kitsap County Sheriff's Department. A municipality may be held liable under§ 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury . . . ." Monell v. Dep't of Soc. Serv., 436 U.S. 658, 694 (1978). Although inadequacy of police training may serve as the basis for municipal liability in certain circumstances, the evidence presented by Case does not support such a claim, nor can liability be predicated on the isolated sporadic events in this case. See City of Canton v. Harris, 489 U.S. 378, 388 (1989); Thompson v. City of Los Angeles, 885 F.2d 1439, 1443-44 (9th Cir. 1989).
 
 C. Tort of Outrage
 
 45
 Finally, the district court did not err by dismissing Case's outrage claim. Under Washington law, only conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community," supports an outrage claim. See Reid v. Pierce County, 961 P.2d 333, 337 (Wash. 1998) (quoting Grimsby v. Samson, 530 P.2d 291, 295 (Wash. 1975) (citation omitted)). "[T]he trial court must make an initial determination as to whether the conduct may reasonably be regarded as so `extreme and outrageous' as to warrant a factual determination by the jury." Jackson v. Peoples Fed. Credit Union, 604 P.2d 1025, 1028 (Wash. Ct. App. 1979). When conduct offered to establish outrage is not extreme, "a court must withhold the case from a jury notwithstanding proof of intense emotional suffering." Brower v. Ackerley, 943 P.2d 1141, 1149 (Wash. Ct. App. 1997).
 
 
 46
 We conclude that the deputies' conduct was not so extreme as to support an outrage claim. Therefore, even if Case suffered emotional distress, the district court properly dismissed her claim.
 
 CONCLUSION
 
 47
 The district court's orders granting summary judgment in favor of the County and denying Case's motion for reconsideration are AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 Indeed, Case's complaint refers to the Kitsap County residence as "the home in which [she] was residing." Furthermore, following his arrest, Russell indicated that Case was his next of kin and that she could be reached at his Kitsap County address.
 
 
 [2]
 The district court held that Case did not name the deputies in their individual capacities but assumed "for the sake of argument" that she named them in both their official and individual capacities. The district court then went on to address the qualified immunity issue.
 
 
 [3]
 The warrant need not be in the officers' possession at the time of the arrest. See RCW § 10.31.030 (permitting officers to arrest without a warrant in possession at the time of arrest provided that it "be shown to the defendant as soon as possible on arrival at the place of intended confinement"); accord Ruiz v. Craven, 425 F.2d 235, 236 (9th Cir. 1970) (concluding that arrest by city police was supported by probable cause where the officers had received official information that the defendant was wanted on outstanding federal warrant).
 
 
 [4]
 Case argues, without support, that the Oregon warrant was merely a "quasi-criminal warrant" because it was issued in connection with a civil divorce proceeding. That argument begs the question because it was in fact a felony warrant. Moreover, that argument does not affect a qualified immunity analysis, which turns on whether a reasonable officer could have concluded--faced with the word of the Yamhill County District Attorney's office and confirmation by the NCIC--that the valid Oregon warrant was for felony nonsupport.
 
 
 [5]
 Ex parte Crawford, 268 P. 871 (Wash. 1928), is inapposite. See Dissent at 5918. There, the Washington Supreme Court held that "the territorial jurisdiction of the justices of the peace . . . is confined to their respective counties." Crawford, 268 P. at 872. Not only is Crawford contrary to current Washington statutes, see RCW §§ 3.30.015, 3.66.100 (extending territorial jurisdiction of judges to throughout the state), but it did not address out-of-state warrants, which are now subject to Washington's Uniform Criminal Extradition Act, see RCW § 10.88 et seq.
 
 
 FERGUSON, Circuit Judge, dissenting:
 
 48
 The majority holds that county sheriffs may forcibly enter a home, search, and make a warrantless arrest simply because an out-of-state warrant is listed in a federal computer database. Until today, we have held that officers may consider out-of-state computer information as one element in the determination of probable cause, but we have never held that such information satisfies the warrant requirement for forcible home entries. The majority's ruling enlarges the authority of local law enforcement officers, obscures the difference between the powers of federal and local police, and undermines the Fourth Amendment. Therefore, I respectfully dissent on the issue of qualified immunity and the state law claim of outrage.
 
 A.
 
 49
 In July, 1993, Appellant Dawn Case, who then lived in Yamhill County, Oregon, was $2,554.00 behind in court-ordered child support payments to her former husband. As a result, she was placed on probation and required to serve 48 hours in jail every month. When she again fell behind in her payments, an Oregon warrant was issued for her arrest. At that time, however, Ms. Case was living with her boyfriend Mr. Russell in Kitsap County, Washington.
 
 
 50
 In 1994, when Ms. Case was still behind in her child support and had not reported to jail, the Oregon Yamhill County district attorney's office contacted Kitsap County, Washington to advise them of the outstanding warrant. The Kitsap County deputy sheriff's department then checked the National Crime Information Center (NCIC) computer database to verify that the warrant was in the national system. The department did not receive the actual warrant.
 
 
 51
 Kitsap County sheriffs went to visit Ms. Case, leaving a message when they found that she was out walking the dogs. Ms. Case cooperated by promptly telephoning them to discuss the problem. After employees in the warrants office asked her to stay at home so that a deputy could speak with her in person, the deputies went to Mr. Russell's home to arrest Ms. Case. When the deputies received no response to their knocking, Deputy LaFrance, drew his weapon, opened a window, pushed back the shades, and stuck his head and arm inside. Mr. Russell said that he would not allow officers to enter without a warrant. Deputy LaFrance then kicked the door open, breaking the doorframe and damaging the inside wall. At gunpoint, he directed Mr. Russell to be seated on the couch, and searched for Ms. Case, who he eventually found hiding behind some clothes in a closet.
 
 
 52
 The officers arrested Ms. Case as a fugitive on the Oregon warrant and Mr. Russell for rendering criminal assistance, took them to the Kitsap County Jail, and booked them.[1] The Kitsap County prosecuting attorney's office charged Ms. Case with being a fugitive from justice. After a court appearance, Ms. Case was released on her own recognizance, and told to return in two days. At that point, the court dismissed the fugitive charge against her. After her release, Ms. Case returned to Yamhill County, Oregon to pay her child support, admitted to violating the terms of her probation, and was sentenced to the time served in Kitsap County, Washington.
 
 
 53
 Ms. Case then filed an action in the Federal District Court in Washington, claiming that officers in Kitsap County, Washington violated her constitutional rights under 42 U.S.C. § 1983. She brought claims for false arrest, illegal search and seizure, negligent investigation of the warrant, inadequate municipal training, trespass, malicious prosecution, and a Washington state tort law claim of outrage. The trial court granted summary judgment to defendants on all counts. Ms. Case appeals the false arrest, illegal search and seizure, inadequate municipal training, and state law outrage claims. We review de novo the district court's summary judgment determination. Weiner v. San Diego County, 210 F.3d 1025, 1028 (9th Cir. 2000).
 
 B.
 1. Validity of the Out-of-State Warrant
 
 54
 The majority holds that Washington officers could reasonably have believed that they acted legally pursuant to the Oregon warrant. The officers should reasonably have known, however, that an Oregon warrant has no authority in Washington. Inherent in the notion of state sovereignty is the idea that state court authority extends only to those within its boundaries. State and local law enforcement officers therefore have only the powers authorized by their own state -- limited, of course, by the federal constitution. Furthermore, both state and federal law establish that state judicial officers may only issue warrants extending to the boundaries of their territorial jurisdiction. The officers' conduct was even more deeply troubling since they did not even possess the out-of-state warrant when they broke into the home to arrest Ms. Case.
 
 
 55
 The Supreme Court has long declared that each state is independent and sovereign, see, e.g., Buckner v. Finley, 27 U.S. 586, 590 (1829), and has clearly asserted the consequent limitations on state power. In 1878, in the seminal case of Pennoyer v. Neff, the Court explained that
 
 
 56
 no State can exercise direct jurisdiction and authority over persons or property without its territory. The several States are of equal dignity and authority, and the independence of one implies the exclusion of power from all others. And so it is laid down by jurists, as an elementary principle, that the laws of one State have no operation outside of its territory, except so far as is allowed by comity; and that no tribunal established by it can extend its process beyond that territory so as to subject either persons or property to its decisions. `Any exertion of authority of this sort beyond this limit, . . . is a mere nullity. . . .' 95 U.S. 714, 722-723 (1878) (citations omitted).
 
 
 57
 More recently, the Supreme Court has decreed that state courts' power extends only to "the territorial limits of each State's authority," Burnham v. Superior Court of California, County of Marin, 495 U.S. 604, 609 (1990), and that states may not "reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system," World-Wide Volkswagon Corp. v. Woodson, 444 U.S. 286, 292 (1980).
 
 
 58
 In a recent application of the state sovereignty rule, the Supreme Court decided that part of Ellis Island belonged to New Jersey and, therefore, that "the State of New York is enjoined from enforcing her laws or asserting sovereignty over the portions of Ellis Island that lie within the State of New Jersey's sovereign boundary." New York v. New Jersey, 526 U.S. 589, 589 (1999). Similarly, warrants issued by the courts of Oregon convey no authority to law enforcement officers in Washington.
 
 
 59
 It is commonly understood that these limitations on state power apply to warrants. In fact, a warrant's authority frequently extends only to the county or city of issue. See, e.g., Restatement (Second) of Torts §129 (1965) (An arrest pursuant to a warrant may not be made "unless it is made within the territory within which the court, body, or official issuing the warrant has authority to order the arrest."); Wayne R. LaFave et al., Criminal Procedure § 1.7(f) n. 101 (2d ed.) ("When the officer acts pursuant to a warrant, he or she is clothed with the authority of the process of the court, which typically extends statewide as to arrest warrants."); 5 Am. Jur. 2d Arrest § 34 (2000) ("As a general rule, a warrant of arrest has no effect beyond the territorial jurisdiction of the authority by which it was issued and may not be executed by an officer beyond the territory to which his authority pertains. . . . Under some statutes, however, a municipal police officer may make an arrest anywhere within his own county under a warrant issued by the proper authority of his municipality for an offense committed therein."); See also Elder v. Holloway, 874 F. Supp. 278, 282 (D. Idaho 1995) (assuming an arrest in Idaho to be warrantless despite the existence of two Florida warrants).[2]
 
 
 60
 Washington courts have clearly recognized this rule.[3] "It is elementary law that, in the absence of constitutional or statutory authority, a warrant of arrest cannot be lawfully executed by arresting the accused beyond the territorial jurisdiction of the justice or court issuing it." In re Crawford, 148 Wash. 265, 268 (1928) aff'd, 150 Wash. 698 (1929).[4] See also State v. Lee, 738 P.2d 1081, 1083 (Wash. Ct. App. 1987). Washington statutes currently allow officers to pursue a suspect outside of the county that issued the warrant, Wash. Rev. Code Ann. § 10.34.010, but not outside the state. Moreover, Washington criminal rules require warrants to be made"in the name of the State of Washington." Wa. St. Super. Ct. CR CrR 2.2(b)(3). The Oregon warrant for Ms. Case's arrest reads, "in the name of the State of Oregon. . . ." In fact, the warrant in this case makes clear that it can only be served in Oregon; it states that the peace officer who arrests the defendant is commanded to bring Ms. Case "forthwith before a magistrate or jailer of this county." (Emphasis added).
 
 
 61
 The majority correctly acknowledges that state extradition law requires that a warrant be issued by a Washington judge or magistrate before an arrest can be made. Majority op. at 927; Wash. Rev. Code Ann. § 10.88.320. In fact, both federal and state extradition law clearly limit the situations in which an arrest can be made based on an out-of-state crime. See U.S. Const. art. IV, § 2, cl. 2; Wash. Rev. Code Ann. §§ 10.88.210, 10.88.260 (allowing for arrests upon an extradition warrant on the demand of an executive authority). Additionally, Washington extradition law contains clear safeguards to protect suspects from wrongful arrest based on out-of-state warrants. Wash. Rev. Code Ann. §§ 10.88.220 (requiring an affidavit substantially charging the suspect of a crime, as well as a copy of the warrant, before a Washington judge may issue an extradition warrant); 10.88.320 (providing that a Washington judge may issue an arrest warrant for an out-of-state crime based on the sworn testimony of a credible person). These requirements would be meaningless if a Washington officer could simply act on knowledge of an out-of state warrant.
 
 
 62
 Moreover, Washington has recognized that, absent proper extradition procedures, it cannot instigate an arrest in another state. State v. Lee, 738 P.2d 1081, 1083 (Wash. Ct. App. 1987). The inverse is obviously true as well: an out-of-state warrant has no legal effect in Washington. Kitsap County sheriffs were clearly informed of this rule. Indeed, their own policy manual explains that, in the absence of urgency, sheriffs should have a fugitive warrant before making an arrest based on an out-of-state crime.
 
 
 63
 According to the majority, persuasive authority supports the proposition that officers need not obtain a duplicate Washington warrant. Majority op. at 927. Most of these cases, however, are inapposite, or at least inconclusive. See, e.g., Lowrance v. Pflueger, 878 F.2d 1014, 1020 (7th Cir. 1989) (holding that officers in Wisconsin could rely on a Tennessee warrant confirmed through the NCIC as evidence of probable cause, not as a substitute for a warrant); United States v. Johnson, 815 F.2d 309, 313 (5th Cir. 1987) (holding that officers could arrest the defendant in Texas based on evidence of an outstanding California warrant where Texas law did not require a warrant); Ierardi v. Gunter, 528 F.2d 929, 931 (1st Cir. 1976) (holding that Massachussets need not find probable cause anew, but not clarifying whether officers could rely directly upon the out-of-state warrant or whether the Massachussets court would still need to issue a warrant).
 
 
 64
 Thus, only the Tenth Circuit and the District Court of New Jersey have decided that officers can simply use a warrant issued out-of-state rather than one issued in their own jurisdiction. See United States v. Smith, 131 F.3d 1392, 1397-8 (10th Cir. 1997); Allen v. Wrightson, 800 F. Supp. 1235, 1238 (D.N.J. 1992). Because these courts fail to give adequate weight to the importance of state sovereignty in the issuance of arrest warrants, I disagree with their conclusions.
 
 2. Warrantless Home Arrest
 
 65
 The majority attempts to evade the clear requirements of Washington law by remarking that Washington does not require a warrant for a felony arrest. Majority op. at 926; Wash. Rev. Code Ann. § 10.88.330. As the majority must realize, this Washington statute is subject to the clear federal constitutional prohibition against warrantless home arrests. "It is axiomatic that `the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' " Welsh v. Wisconsin, 466 U.S. 740, 748 (1984) (citations omitted). Consequently, searches and seizures inside a home without a warrant are presumptively unreasonable. Payton v. New York, 445 U.S. 573, 576 (1980). In the absence of a warrant, police may only arrest a suspect in a home -- even a temporary residence -- under exigent circumstances. Welsh, 466 U.S. at 749-50; United States v. Albrektsen, 151 F.3d 951, 953 (9th Cir. 1998) (finding the suspect protected from warrantless arrest in his motel room). There was no urgency here; Ms. Case was simply behind in her child support. The police knew where she was and she was not poised to flee. Nonetheless, sheriffs broke into the residence where she was living and arrested her at gunpoint.
 
 
 66
 The defendants do not claim, and could not claim, that exigent circumstances justified a warrantless arrest. Exigent circumstances exist when police (1) are in hot pursuit of a felon; (2) fear imminent destruction of evidence; (3) fear that the suspect might escape; or (4) are concerned that harm will occur to police or others in or near the dwelling. Minnesota v. Olson, 495 U.S. 91, 100 (1990). None of these elements were present here. Ms. Case was not violent and, rather than eluding the authorities, she had recently returned the call made to her by the Yamhill County District Attorney's office, and had maintained frequent contact with her ex-husband in Oregon to whom she owed the child support.
 
 
 67
 The non-violent, domestic nature of Ms. Case's offense underscores the unconstitutionality of the police entry. The Supreme Court has particularly protected the home from warrantless police entry when the suspect committed only a minor offense. See Welsh, 466 U.S. at 753-54 (finding no exigent circumstances justifying a home arrest when the suspect was wanted for driving under the influence, even though police feared the evidence -- the alcohol level in defendant's bloodstream -- would be imminently destroyed). Ms. Case was merely in arrears in her child support. While this is by no means commendable, Kitsap County officers displayed"a shocking lack of all sense of proportion" when they broke down Mr. Russell's door and held both Ms. Case and Mr. Russell at gunpoint. Id. at 751 (citing McDonald v. United States, 335 U.S. 451, 459 (1948) (Jackson, J. dissenting).
 
 3. Arrest based on an NCIC Listing
 
 68
 The majority refers to the "long line of cases " demonstrating that an "NCIC hit" can establish probable cause for arrest. Majority op. at 928, citing United States v. Palmer, 536 F.2d 1278, 1283 (9th Cir. 1976); Scull v. New Mexico , 236 F.3d 588, 599 (10th Cir. 2000); Lowrance v. Pflueger , 878 F.2d 1014, 1017 (7th Cir. 1989); United States v. Towne, 870 F.2d 880, 882 (2nd Cir. 1989); United States v. Roper , 702 F.2d 984 (11th Cir. 1983); United States v. Munoz, 150 F.3d 401, 411 (5th Cir. 1998) (analyzing the use of an NCIC hit for an in-state warrant). While it is true that an NCIC hit regarding an out-of-state warrant may in some cases constitute probable cause, the question at issue is not whether there was probable cause, but whether there was a valid warrant. These cases do not establish that an NCIC hit of an out-of-state warrant may substitute entirely for a warrant issued within the jurisdiction. Again, the Kitsap County sheriffs policy manual clearly reflects established law, noting that a hit in the NCIC constitutes "added probable cause" for an arrest. This would be unnecessary and illogical if an NCIC hit also substituted entirely for a warrant.
 
 
 69
 Arizona v. Evans, 514 U.S. 1 (1995), alerts us to the danger of relying too extensively on the NCIC. In Evans , the Supreme Court considered the application of the exclusionary rule for an arrest made on an erroneous NCIC listing. Justice O'Connor's concurrence aptly noted that by limiting itself to the question of the exclusionary rule, the court avoided confronting a harder question:
 
 
 70
 While the police were innocent of the court employee's mistake, they may or may not have acted reasonably in their reliance on the recordkeeping system [the NCIC computer database] itself. Surely it would not be reasonable for the police to rely, say, on a recordkeeping system, their own or some other agency's, that has no mechanism to ensure its accuracy over time and that routinely leads to false arrests . . . . Id. at 16-17.
 
 
 71
 She continued, "[w]ith the benefits of more efficient law enforcement mechanisms comes the burden of corresponding constitutional responsibilities." Id. at 17-18.
 
 
 72
 The NCIC does, in fact, run a dangerously high risk of error. See, e.g. Clanton v. Cooper, 129 F.3d 1147, 1155-56 (10th Cir. 1997) (plaintiff subject to wrongful detention because fire marshall intentionally entered false information into the NCIC asserting that plaintiff may have been involved in a homicide); Rogan v. City of Los Angeles, 668 F. Supp. 1384 (C.D. Cal. 1987) (plaintiff arrested five times, three times at gunpoint, after stops for minor infractions based on erroneous NCIC listing); Finch v. Chapman, 785 F. Supp. 1277, 1278-79 (N.D. Ill. 1992) (plaintiff wrongfully arrested and detained twice based on misinformation in NCIC); United States v. Mackey, 387 F. Supp. 1121, 1124 (D. Nev. 1975) (plaintiff subject to wrongful arrest based on erroneous NCIC listing). In fact, testimony suggested that on the day that the respondent in Arizona v. Evans was wrongfully arrested based on a previously quashed warrant still listed in the NCIC, "three other errors of the very same kind had occurred on `that same day.' " Evans, 514 U.S. at 28 (Ginsberg, J., dissenting). Even the Oregon NCIC manual on data entry and system upkeep acknowledges the risk of error. By allowing police to rely exclusively on such a deeply flawed system rather than continuing to require a state-issued warrant, the majority heightens the risk of improper arrests.
 
 
 73
 Moreover, Washington law does not provide for the service of any warrants, let alone out-of-state warrants, by computer listings. Warrants may be served by telegraph or teletype, but only when specifically authorized by the judge or magistrate, Wash. Rev. Code Ann. § 10.31.060, which was not done here. More importantly, the teletype warrant statute relates only to arrests within the state, allowing for service by telegraph or teletype when "the magistrate issuing such warrant, or any justice of the supreme court, or any judge of either the court of appeals or superior court authorizes such service." Id. (emphasis added). It is obvious that the authorization was directed to Oregon courts; state legislative power does not extend to other states. Washington law thus further supports the invalidity of serving a warrant over the NCIC.
 
 4. Entry Without a Physical Warrant
 
 74
 Washington officers' failure to present the warrant at the time of their entry was at best foolhardy.[5] An essential function of a warrant is to assure the subject of the search that her privacy is being invaded only to the extent authorized by law. Michigan v. Tyler, 436 U.S. 499, 508 (1978); United States v. Chadwick, 433 U.S. 1, 9 (1977), abrogated on other grounds; United States v. Gantt, 194 F.3d 987, 1001 (9th Cir. 1999). Furthermore, "[c]courts have typically assumed that the absence of a warrant creates a `greater potential for confrontation and violence.' " Gantt, 194 F.3d at 992 (citation omitted). One purpose of the warrant requirement, "like that of the `knock and announce rule,' is to head off breaches of the peace by dispelling any suspicion that the search is illegitimate." Id. (citation omitted).
 
 
 75
 The facts of this case clearly underscore the importance of these policies. When officers arrived at his house, Mr. Russell specifically asked them to show him a warrant. When the officers failed to display one, he refused to open the door. " `[T]he breaking an outer door is, in general, so violent, obnoxious and dangerous a proceeding, that it should be adopted only in extreme cases, where an immediate arrest is requisite.' " Ker v. California, 374 U.S. 23, 54 (1963) (Brennan, J. dissenting) (citations omitted). Nonetheless, the officers entered violently, breaking down the door and searching and arresting the occupants at gunpoint, simply because Ms. Case was in arrears in her child support.
 
 5. Qualified Immunity
 
 76
 The majority claims that police officers are entitled to qualified immunity. This, however, turns the law on its head, allowing police officers to escape immunity solely because they don't know the law. A police officer is entitled to qualified immunity if, in light of clearly established principles, the officer could objectively believe that his conduct was reasonable. This requires a two-part inquiry: (1) was the law governing the officers' conduct clearly established; and (2) under the law, could a reasonable officer believe that the conduct was lawful. Ortega v. O'Connor, 146 F.3d 1149, 1154 (9th Cir. 1998); Act Up!/Portland v. Bagley, 988 F.2d 868, 871-72 (9th Cir. 1993).
 
 
 77
 In the present case, the law was clearly established. It has long been the rule that, absent exigent circumstances, a warrantless arrest in a home is unconstitutional. See, e.g., Payton, 445 U.S. at 586; Welsh, 466 U.S. at 749-50. At issue in this case, then, is simply the question of whether the law was clearly established as to the validity of an out-of-state warrant in Washington. As described above, the rule that state judicial officers cannot extend their authority beyond their own territory is inherent in the very notion of state sovereignty, reasserted through a long line of federal cases, and reflected in Washington law. Furthermore, the specific rule limiting the validity of arrest warrants to the territorial jurisdiction of their issue is based in the common law, repeated as basic principle in scores of treatises, and has been repeatedly followed by the Washington courts. Therefore, the officers violated clearly established law.
 
 
 78
 A reasonable officer should have known that the arrest was illegal. This is true when, "in the light of pre-existing law the unlawfulness . . . is apparent." Anderson v. Creighton, 483 U.S. 635, 640 (1987). That was certainly the case here. Not only was federal and state law clear on the invalidity of out-of-state warrants, but the Kitsap County sheriffs' policy manual instructed the officers that they should obtain a fugitive warrant absent urgent circumstances. In fact, even the langauge of the warrant underscored its territorial limitation, requiring officers to bring Ms. Case to a magistrate of Yamhill County, Oregon. Perhaps the out-of-state warrant provided an element of probable cause to arrest Ms. Case. Probable cause, however, is not enough to arrest a person in her home. The police must obtain a warrant, except in cases of hot pursuit or exigent circumstances, neither of which are present here.
 
 
 79
 Officers' violations of the law have been found reasonable when, for example, they must make a close factual determination as to whether exigent circumstances are present, or whether there is sufficient evidence for probable cause. See, id.; Malley v. Briggs, 475 U.S. 335, 344 (1986). No such complex factual considerations were at issue here; officers knew without doubt that the warrant was from out of state and not enforceable in Washington. It was therefore unreasonable for officers to rely upon it in forcibly entering a home, searching for and seizing Ms. Case.
 
 
 80
 "When government officials abuse their offices,`action[s] for damages may offer the only realistic avenue for vindication of constitutional guarantees.' " Anderson, 483 U.S. at 638, quoting Harlow v. Fitzgerald, 457 U.S. 800, 814 (1982). Where, as here, the law is clearly established and officers cannot claim to have been reasonable in failing to comply, qualified immunity cannot be granted.
 
 C.
 
 81
 The majority holds that a forcible warrantless home arrest of a woman wanted for failure to pay child support in another state does not constitute outrage under Washington law, and that the question need not even be put before a jury. I must disagree. Under Washington law, the tort of outrage requires: (1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) actual result to the plaintiff of severe emotional distress. Rice v. Janovich, 742 P.2d 1230, 1238 (Wash. 1987).
 
 
 82
 Whether particular conduct is outrageous is ordinarily put to a jury. Phillips v. Hardwick, 628 P.2d 506, 510 (Wash. App. 1981). Only conduct which is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community" results in liability. Grimsby v. Samson, 530 P.2d 291, 295 (Wash. 1975). However, Washington courts have required the submission of the question of outrage to a jury even when plaintiffs were merely forced to move furniture unnecessarily. Phillips, 628 P.2d at 511 (finding that a jury should have determined whether defendants committed the tort of outrage by forcing plaintiffs to move all furniture out of the home they had just bought, even though defendants were not planning to move back).
 
 
 83
 In the present case, the officers without a warrant, responding to an allegation of a failure to pay child support in another state, arrived at the house, opened a window, and held a drawn gun toward Mr. Russell. When Mr. Russell chose not to let them in because they did not show a warrant, even after he requested one, they broke the door open and then arrested Mr. Russell and Ms. Case at gunpoint. If asking a family to move furniture may constitute outrage, then breaking down the door of a home with guns drawn to locate a non-violent woman in a child support case that happened in another state certainly rises to this level as well.
 
 
 84
 Defendants suggest that since officers were not aware that Ms. Case had any particular susceptibility to emotional distress, she cannot make out a claim for outrage. However, susceptibility to distress is only one factor Washington courts consider in deciding whether conduct is outrageous, and is not necessarily determinative. The courts also consider, among other factors, the position the defendant occupies and the awareness that such conduct is likely to cause emotional distress. Phillips, 628 P.2d at 510. Courts are more likely to find outrage when the defendant is a sheriff, a position of significant authority. Robins v. Harum, 773 F.2d 1004, 1011 (9th Cir. 1985). Additionally, police officers should be aware that a violent interaction such as arresting someone at gunpoint is likely to cause emotional distress. See id. (finding a jury case on outrage when police struggled to remove suspects from a car.) Therefore, even if Ms. Case had no particular susceptibility to distress, the question of outrage should have been put to a jury.
 
 
 85
 Ms. Case states that she suffers anxiety attacks, at times cannot get out of bed or out of the house, cannot function normally, and is having trouble working. A jury could find that such anxiety and failure to function rises to the level of severe distress. See, e.g., Brower v. Ackerly , 943 P.2d 1141(Wash. App. 1997) (finding that insomnia, severe stress, and an inability to function properly could constitute severe emotional distress).
 
 
 86
 Since reasonable minds could differ as to whether the deputies' conduct was sufficiently outrageous, reckless, and intentional in the present case, and as to whether it caused Ms. Case to suffer severe emotional distress, the question should have been put to a jury.
 
 
 87
 I therefore dissent.
 
 
 
 Notes:
 
 
 [1]
 Mr. Russell posted bail and was released the same day.
 
 
 [2]
 The rule that warrants are limited by their place of issue is also illustrated by Federal Rule of Criminal Procedure 41, which provides that for a federal crime, a state court within a district may only issue a warrant for a person within that district. (In contrast, a federal magistrate may issue a warrant for a person outside the district if that person was in the district when the warrant was sought.)
 
 
 [3]
 State law is not necessary to this analysis, but it does highlight how the law on these issues was readily available to and should have been understood by the sheriffs at the time of the arrest.
 
 
 [4]
 As the majority points out, Washington statutes have changed the jurisdictional reach of magistrates, and Crawford referred to the reach of warrants between counties, not states. Majority op. at 927. Nonetheless, the general proposition that a warrant has a limited territorial reach still holds true.
 
 
 [5]
 Washington law authorizes arrests even when an officer does not have the warrant in his possession at the time of arrest. However, the officer must "declare that the warrant does presently exist and will be shown to the defendant as soon as possible on arrival at the place of intended confinement." Wash. Rev. Code Ann. § 10.31.030. The parties did not argue before this Court as to whether these requirements were met, nor did they contest the constitutionality of the statute.